UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS GERING,

    Plaintiff,                                         Case No. 05-73458

v.                                                 Hon. Lawrence P. Zatkoff

FRAUNHOFER USA, INC., and
FRAUNHOFER-GESELLSCHAFT e.V.,

    Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on September 3, 2009

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court on Fraunhofer USA, Inc.'s ("FUSA") Motion for Summary Judgment (Docket #154). The parties have fully briefed the issues. The Court finds that the facts and legal arguments pertinent to FUSA's Motion are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that FUSA's Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, FUSA's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

Plaintiff Thomas Gering ("Plaintiff") is a German citizen who lives in Sarasota, Florida. Defendant Fraunhofer-Gesellschaft e.V. ("FHG") is a non-profit corporation based in Munich, Germany. FHG's primary business is to conduct research and development at numerous Institutes it operates in Germany. At all times relevant to this case, FHG also operated the Patentstelle ("Patent Center"), a division of FHG in Germany that endeavors to commercialize patents generated by the FHG Institutes and outside inventors.

FUSA is a wholly-owned subsidiary of FHG based in Plymouth, Michigan. FUSA is not self-supporting. FUSA receives funding for its operations from various U.S. sources, including federal and state governments, universities, and private industries. FUSA also receives operational funding from FHG several times a year. Typically, FHG transfers money to FUSA accounts and FUSA then makes specific requests to use the money for various operational purposes. Nonetheless, FUSA files its own tax returns and its own financial statements rather than filing consolidated financial statements with FHG.

A seven member Board of Directors governs FUSA, and a majority of the FUSA Directors must be U.S. citizens. It is common for officials from FUSA and FHG to have affiliations with both corporations, and during the time period relevant to this case, three out of seven FUSA Directors were affiliated with FHG. Two of those FUSA Directors also served on the FHG Board of Directors: (a) the Chairman of FUSA's Board of Directors, Hans-Jorg Bullinger ("Bullinger"), who was also the President of FHG, and (b) the President of FUSA's Board of Directors, Dirk Meints-Polter ("Polter").

Plaintiff was employed by FHG and worked at the Patent Center from 1998 through June 30, 2001. While employed by FHG, one of Plaintiff's duties was to act as a liaison between the

Patent Center and Dr. Tassilo Bonzel ("Dr. Bonzel") with respect to litigation to enforce Dr. Bonzel's patent rights in the United States (the "Bonzel Litigation"). The Bonzel Litigation was prosecuted in Minnesota by an Ohio law firm, Wood, Herron and Evans ("Wood Herron"), pursuant to a contingency agreement between Dr. Bonzel, FHG (as the owner of the Patent Center) and Wood Herron ("Contingency Agreement").

Plaintiff took a leave of absence from FHG as of June 20, 2001, to act as the CEO of a German start-up company called Ventratec. Plaintiff asserts that he entered into a written consulting contract ("Consulting Contract") with FHG (the Patent Center) on June 27, 2001. [1] The Consulting Contract, written in German, was signed by Plaintiff and his immediate supervisor, Patent Center director Manfred Paulus, on behalf of the Patent Center. The Consulting Contract provided that FHG would pay Plaintiff a commission of 5% of any settlement proceeds FHG received in the Bonzel Litigation and Plaintiff would continue his work as a liaison to Dr. Bonzel on behalf of the Patent Center. FUSA was not a party to, and FUSA is not mentioned in, either the Consulting Contract or the Contingency Agreement. Plaintiff never spoke to anyone at FUSA about the content or progress of the Bonzel Litigation. In fact, Plaintiff acknowledged that he was unauthorized to do so. Plaintiff also admits he had no personal contact with any U.S.-based employee or officer of FUSA.

Ultimately, the parties to the Bonzel Litigation reached a settlement whereby Dr. Bonzel received approximately $80 million. According to the Contingency Agreement, FHG was entitled to $20 million of the $80 million settlement amount. In October 2002, FHG issued an invoice to Dr. Bonzel for its portion of the settlement proceeds from the Bonzel Litigation. FHG

---

[1] Defendants to this action dispute (a) that the Consulting Contract was executed on or about June 27, 2001, and (b) the validity of the Consulting Contract (even if so executed) because it was not formally approved by at least two members of FHG's four-member Executive Board.

3

directed Wood Herron (then in possession of the funds) to transfer the funds due FHG into FUSA's account to save FHG from paying two exchange rate charges.[2] Pursuant to FHG's directive, the first installment of approximately $14.4 million was transferred into FUSA's account on December 18, 2002. FUSA placed the funds in a certificate of deposit and the money remained in FUSA's account until January 2003 because FHG wanted to hedge against a drop in the exchange rate. Then, as directed by FHG, FUSA forwarded the entire amount of funds received on FHG's behalf, including interest that had accrued, to FHG on January 3, 2003. FHG also directed Wood Herron to wire the second installment due FHG to FUSA, and on October 21, 2004, FUSA received approximately $6 million from Wood Herron. At FHG's direction, FUSA again forwarded all of those funds, together with accrued interest, to FHG on January 10, 2005.

FUSA never drew against the FHG funds transferred from Wood Herron to the FUSA accounts in 2002 or 2004, nor did FUSA ever make a request to draw against such funds. FUSA had no involvement in obtaining the money that was temporarily in its accounts. In fact, at the time of the 2002 and 2004 transfers from Wood Herron, FUSA's treasurer was unsure why FHG had the $20 million wired to FUSA's account because FUSA had not requested those funds.

Although Plaintiff knew the funds were going to be transferred to the FUSA account in 2002 and 2004, he did not object to those transfers. In fact, Plaintiff worked with FHG Finance Department Director Andreas Meurer ("Ms. Meurer") to coordinate the transfer of funds from Wood Herron to FUSA in 2002 and 2004. Plaintiff did not ask to be paid from the funds in FUSA's account on either occasion. Instead, Plaintiff submitted payment requests to the Patent

---

[2] If the money was transferred from Wood Herron's U.S. account to FHG's German account, and then from FHG's account to FUSA's account the next time FHG needed to supplement FUSA's operating costs, FHG would have been subject to an exchange rate charge each time.

4

Center for the 5% commission he believed he was entitled to under the Consulting Contract. Plaintiff also contends that he spoke to Polter and Bullinger concerning payments under the Consulting Contract. Polter was a member of the FHG Board of Directors from 1989 to 2007, was FUSA's founding President in 1994, and is currently the Vice Chairman of the FUSA Board of Directors. Bullinger serves as both the President and a Board member of FHG. Bullinger also has served as the Chairman of the FUSA Board of Directors since 2002. Plaintiff contends Polter and Bullinger shifted the funds between FHG and FUSA to avoid paying Plaintiff for his work on the Bonzel Litigation, but Plaintiff has produced no evidence that either Polter or Bullinger was acting in his capacity as a FUSA official at the time he discussed compensation with Plaintiff.

When Plaintiff realized that FHG would not pay him all the commission he believed he was due under the Consulting Contract, he employed a debt collector to help recover the money from FHG. The debt collector eventually sought to collect the money from FUSA as well. Plaintiff subsequently filed this action against FHG and FUSA. On February 21, 2006, the Court denied FUSA's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). On March 20, 2008, the Court denied without prejudice FUSA's initial motion for summary judgment in order to allow the parties an opportunity to conduct discovery. The discovery period has now closed, and FUSA now moves the Court to grant summary judgment with respect to Plaintiff's cause of action against FUSA.

### III.  LEGAL STANDARD

Summary judgment will be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." *Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 637 (6th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if a reasonable jury could find for the non-moving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a reasonable jury could find for the non-moving party, the Court must view all the facts and inferences drawn thereof in the light most favorable to the non-moving party. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.  ANALYSIS

Plaintiff seeks to recover from FUSA for (1) Count I - breach of contract; (2) Count II - tortious interference with contract; (3) Count III - unjust enrichment; (4) Count IV – fraud; and (5) Count V - quantum meruit.

A. **COUNT I (BREACH OF CONTRACT) AND COUNT IV (FRAUD)**

With respect to each of his breach of contract and fraud claims, Plaintiff argues that FUSA is liable for the acts of FHG, its parent corporation, under an alter ego theory.

Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities. *Seaswold v. Hilti Inc.*, 537 N.W.2d 221, 225 (Mich. 1995). Michigan law generally respects separate corporate identities, and the corporate veil will be pierced only to prevent fraud or injustice. *Bodenhamer Bldg. Corp. v. Arch. Research Corp.*, 873 F.2d 109 (6th Cir. 1989). Applicable law provides that a claimant may rely upon the alter ego theory to hold a parent corporation liable for the acts of its subsidiary when the parent controls the subsidiary to such a degree as to make the subsidiary a mere instrumentality through which the parent harms the claimant. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co., Ltd.*, 475 F.3d 783, 798 (6th Cir. 2007). A plaintiff must prove three

6

criteria to satisfy the alter ego theory: (a) control by the parent to such a degree that the subsidiary has become its mere instrumentality; (b) fraud or wrong by the parent through its subsidiary; and (c) unjust loss or injury to the claimant. *Id.*; *Maki v. Copper Range Co.*, 328 N.W.2d 430, 432 (Mich. 1983).

In this case, Plaintiff endeavors to hold FUSA, the subsidiary, liable for the acts of FHG, its parent. Plaintiff presents a novel theory of law to be applied in Michigan, however, as Michigan courts have never applied the alter ego theory to hold a subsidiary liable for the contracts of its parent corporation. To the extent Michigan courts have utilized the alter ego theory to pierce the corporate veil, the case has always involved holding a parent corporation liable for the contracts of its subsidiary because the parent used the subsidiary as an instrument of the parent. *Servo Kinetics,* 475 F.3d at 798. *See also Herman v. Mobile Homes Corp.*, 26 N.W.2d 757 (Mich. 1983). Plaintiff also has not identified authority from another jurisdiction to support his contention that a subsidiary can be held liable for its parents' actions under the alter ego.

Even if there could be a case where the alter ego principles could be applied from the bottom-up (*i.e.,* where a subsidiary could control a parent entity to commit a wrong), the instant case clearly does not present such circumstances.

*1.   Control*

Plaintiff contends that because FHG dominates FUSA, the two corporations are "one and the same," such that the actions of FHG could be imputed to FUSA. Being "one and the same," however, does not satisfy the control element of an alter ego relationship according to Michigan law. To hold FUSA liable for the acts of FHG under the alter ego theory, Plaintiff would first have to show that FUSA dominated and controlled FHG to the extent that FHG became a mere

instrumentality of FUSA. Plaintiff provides no evidence that FUSA ever controlled or dominated FHG, nor is there any evidence that FHG operated as an instrumentality of FUSA. Accordingly, the Court concludes that Plaintiff has failed to show control of FHG by FUSA sufficient to satisfy the first element of the alter ego theory.

*2.  Commission of Fraud or Wrong*

The second element of the alter ego theory requires that one corporation must have utilized a second corporation to commit wrong or fraud. In this case, Plaintiff would have to show that FUSA committed wrong or fraud through its control over FHG. Plaintiff has provided no indication that FUSA was responsible for any of the decisions that resulted in this lawsuit. Rather, Plaintiff has argued that FHG committed the wrongful acts, and Plaintiff consistently states that FHG controlled and dominated FUSA. Therefore, any fraud or wrong that may have occurred cannot be attributed to FUSA.

*3.  Unjust Injury or Loss to Claimant*

Plaintiff states that the Consulting Contract was entered into by FHG, and that Plaintiff's alleged "unjust injury or loss" was caused by FHG's failure to pay him out of the settlement proceeds from the Bonzel Litigation. Again, this alleged loss is attributable to FHG, not FUSA. Accordingly, to the extent there is any unjust injury or loss, it does not constitute a basis for an alter ego claim against FUSA.

*4.  Prior Opinion and Order*

In support of his alter ego theory, Plaintiff cites a statement the Court made in its February 21, 2006, Opinion and Order. Therein, the Court stated, "the activities of FHG, having been imputed to FUSA via the alter ego theory, can tie FUSA to the fraud claim." When that statement was written, however, the Court was analyzing a motion to dismiss for failure to state a

8

claim. Thus, at that time, the Court was considering only whether the allegations, if true, stated a claim upon which relief *could* be granted. In deciding the instant motion for summary judgment, however, the Court must assess whether there are facts that support the claim. As discussed above, there are no facts to support a claim based on the alter ego theory where FUSA is the controlling entity.

     5.    *Conclusion*

The undisputed facts demonstrate that there is no basis for holding FUSA liable to Plaintiff under an alter ego theory. Therefore, Plaintiff's claims against FUSA for breach of contract and fraud are not viable, and FUSA is entitled to summary judgment on Plaintiff's breach of contract claim (Count I) and fraud claim (Count IV).

**B.**    **COUNT II (TORTIOUS INTERFERENCE )**

Plaintiff contends FUSA tortiously interfered with the Consulting Contract, as well as with Plaintiff's business relationship with Wood Herron.[3] To succeed on a tortious interference claim, Plaintiff must show (1) the existence of a contract, (2) breach of the contract, and (3) an unjustified instigation of the breach by FUSA. *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157 (Mich. 2004). In other words, Plaintiff must prove that, for purposes of invading Plaintiff's rights, FUSA either (a) *intentionally* committed a per se wrongful act, or (b) committed a lawful act with malice that is unjustified in law. *CMI Int'l Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. 2002) (emphasis added).

     1.    *Interference with Consulting Contract*

---

[3] The Court notes that Plaintiff's argument that FHG and FUSA are "one and the same" is in direct conflict with Plaintiff's claim of tortious interference with the Consulting Contract. Assuming that FHG and FUSA are "one and the same," that tortious interference claim is not viable because "one may not tortiously interfere with one's own contract." *Fletcher v. Electronic Data Systems*, 2003 WL 218180, at *11 (E.D. Mich. Jul. 8, 2003)(citing *Wilkinson v. Powe*, 1 N.W.2d 539 (Mich. 1942)).

9

At his deposition, Plaintiff admitted that he has no information that anyone at FUSA tried to interfere with his Consulting Contract with FHG. Plaintiff also admitted that he never sent FUSA a letter requesting payment of commission due under the Consulting Contract, nor did he ever ask FUSA to keep the settlement funds and pay him from those funds. The depositions of various FHG personnel in Germany also yielded no evidence that FUSA interfered with any contract between Plaintiff and FHG. Ms. Meurer, the FHG employee directly involved in the transfer of the funds from Wood Herron to FUSA and from FUSA to FHG, gave the following uncontroverted testimony: (1) FHG decided how and when to transfer the funds to FUSA from Wood Herron and from FUSA to FHG, and (2) no one from FUSA made any decision about what to do with the funds deposited in FUSA's account. Moreover, FUSA's acceptance of the funds and subsequent transfer of those funds back to FHG cannot be construed as a per se wrongful act. Channeling funds to FUSA does not give rise to a cause of action, and FHG claims legitimate reasons for transferring the funds in this manner.[4] Accordingly, the Court finds Plaintiff has produced no evidence that would demonstrate that FUSA intentionally interfered with his contract in a manner amounting to a per se wrongful act.

Plaintiff also fails to show that FUSA committed a lawful act with the malicious intent to harm Plaintiff. *CMI,* 649 N.W.2d at 812. Plaintiff offers no evidence that FUSA accepted the funds from FHG (its parent corporation) knowing that doing so would deprive Plaintiff of his rights under the Consulting Contract or otherwise. Plaintiff admits that he did not provide a copy of the Consulting Contract to FUSA, and he is not aware whether FUSA received a copy from any other source. As noted above, Plaintiff also admits that he never made a request or demand

---

[4] As discussed in Section II., *supra*, the funds were transferred in this manner to (a) avoid paying exchange fees twice since FHG would inevitably transfer funds to FUSA again at some point, and (b) hedge against an expected unfavorable change in the exchange rate.

10

for payment from FUSA. As FUSA had no knowledge of Plaintiff's alleged contract with FHG, FUSA could not have maliciously committed the lawful act of transferring those funds.

For the reasons stated above, the Court concludes Plaintiff has failed to show that FUSA has tortiously interfered with the Consulting Contract.

### 2. *Interference with Wood Herron Relationship*

In his Complaint, Plaintiff alleges that he was working with Wood Herron when "officials for both FHG and FUSA admonished [Wood Herron] to cut ties to [Plaintiff] and ignore his commission." At his deposition, however, Plaintiff stated that he "[did]n't have information" that anyone from FUSA interfered with any relationship Plaintiff had with Wood Herron. As discussed above, certain persons (namely Bullinger and Polter) were Directors for both FHG and FUSA. Even if certain individuals encouraged Wood Herron to cut ties with, and refuse payments to, Plaintiff, Plaintiff has failed to offer any evidence that the officials admonishing Wood Herron to cut ties with Plaintiff were acting in their capacity as FUSA officials when they did so. The Court also finds that Plaintiff has failed to provide any other evidence that FUSA intentionally interfered, either unlawfully or lawfully and maliciously, with Plaintiff's relationship with Wood Herron.

### 3. *Conclusion*

For the reasons set forth in this Section IV.B., FUSA's Motion for Summary Judgment is granted with respect to Plaintiff's tortious interference claim (Count II).

### C. COUNT III (UNJUST ENRICHMENT) AND COUNT V (QUANTUM MERUIT)

Plaintiff also alleges that FUSA is liable based on the quasi-contractual theories of unjust enrichment and quantum meruit (Counts III and V, respectively). The elements a plaintiff must establish for both unjust enrichment and quantum meruit claims are "(1) the receipt of a benefit

11

by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich.App. 2006) (citing *Barber v. SMH (US), Inc.,* 509 N.W.2d 791, 796 (Mich.App. 1993)). *See also Michigan Ed. Employees Mut. Ins. Co. v. Morris,* 596 N.W.2d 142, 151 (Mich. 1999). "In other words, the law will imply a contract to prevent unjust enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense." *Morris Pumps*, 729 N.W.2d at 904.

In this case, FUSA never received or retained any benefit from Plaintiff's purported services. Plaintiff again erroneously seeks to apply the alter ego theory to say that because he provided a benefit to FHG, he thus provided such a benefit to FUSA. Plaintiff also argues that FUSA received a direct benefit from Plaintiff's work because such work constituted a loan to FUSA since FUSA was entitled to draw off those proceeds if it needed additional cash flow. It is undisputed, however, that FUSA never drew down or utilized the funds in any way and that FUSA transferred to FHG all funds received from Wood Herron on FHG's behalf, including interest. In other words, FUSA simply held the funds in its account as an accommodation to FHG, its parent corporation.

Moreover, even if the temporary holding of the settlement funds constituted a "benefit received" by FUSA, there is no evidence that FUSA retained those benefits in a manner that was inequitable to Plaintiff. *Barber,* 509 N.W.2d at 796. Again, FUSA simply held the funds until transferring all of the funds, as well as all accrued interest, to FHG. To the extent any act wrongfully harmed Plaintiff, such harm resulted from FHG's failure to pay Plaintiff amounts due from the Bonzel Litigation settlement. Such harm was not, however, caused by FHG depositing the funds in FUSA's account.

The Court therefore finds that Plaintiff cannot establish either the receipt of a benefit or the inequitable retention of a benefit by FUSA. Accordingly, the Court also grants FUSA's Motion for Summary Judgment with respect to Plaintiff's unjust enrichment and quantum meruit claims (Counts III and V, respectively).

## V. CONCLUSION

Accordingly, and for the reasons set forth above, FUSA's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

                                        s/Lawrence P. Zatkoff
                                        LAWRENCE P. ZATKOFF
                                        UNITED STATES DISTRICT JUDGE

Dated:  September 3, 2009